Protass Law PLLC

260 Madison Avenue
22nd Floor
New York, NY 10016

T: 212-455-0335
F: 646-607-0760
hprotass@protasslaw.com

May 7, 2022

VIA ECF

Honorable Sidney H. Stein
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:     United States v. Victor Rivera, Case No. 21-CR-221 (SHS)

Dear Judge Stein:

This firm represents defendant Victor Rivera in the referenced matter.  We submit this letter memorandum and the attached exhibits in advance of Mr. Rivera's May 20, 2022 sentencing hearing to educate the Court as to who Mr. Rivera is, his personal and professional background, the offense he committed ██████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████  We hope this letter memorandum will assist the Court in concluding that a sentence of probation with a substantial community service component is both fair, just and appropriate as well as consistent with the dictates of 18 U.S.C. § 3553(a).

## INTRODUCTION

Mr. Rivera, age 61, co-founded and is the former President and Chief Executive Officer of Bronx Parent Housing Network, Inc. ("BPHN") (www.bphn.org), a prominent non-profit housing and social services organization in the South Bronx that "is committed to making a difference in solving the housing problem in New York City by transforming lives and creating holistic paths to employment so that individuals and families can secure safe, clean, affordable and permanent housing."  See https://bphn.org/#vision. On February 7, 2022 Mr. Rivera pled guilty pursuant to a plea agreement with the government to one count of honest services fraud conspiracy in violation of 18 U.S.C. § 1349.  (Exhibit 1.)  In particular, from approximately 2013 to approximately 2020 Mr. Rivera engaged in an unlawful scheme to enrich himself by soliciting and accepting bribes and kickbacks from contractors who provided construction, security and real estate services to BPHN.  (PSR ¶ 13.)

Mr. Rivera very much understands and appreciates that he has no one other than himself to blame for his criminal conduct (or the damage he caused to BPHN as well as the lasting harm he caused himself and his family), for which he is both deeply remorseful and ashamed.  Indeed, Mr. Rivera accepts full responsibility and makes no excuses for his criminal conduct.  In fact, ███████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ Finally, nothing submitted by or on behalf of Mr. Rivera is intended in any way to diminish or detract from the seriousness of his offenses, his unconditional acceptance of responsibility or his remorse for his wrongful actions.

Serious as his conduct may have been, we still submit that, for the reasons detailed herein, this Court should sentence Mr. Rivera to a term of probation with a substantial community service component – a sentence that we submit would be fair, just and appropriate as well as sufficient, but not greater than necessary, to satisfy the penological objectives of 18 U.S.C. § 3553(a).

FACTUAL AND PROCEDURAL BACKGROUND

On September 1, 1990 Mr. Rivera was homeless, illiterate and addicted to crack cocaine.  (PSR ¶ 74.)  September 1, 1990 was also the 14th birthday of Mr. Rivera's son, Victor, Jr., who went searching for and found his father in a crack house in the South Bronx.  (Id.)  Because of his out-of-control addiction, Mr. Rivera did not have the money – not even fifty cents – to buy a birthday present for his son.  (Id.)  Even today Mr. Rivera vividly recalls the "look of disgust" on his son's face upon finding him in that crack house on his birthday.  (Id.)

September 1, 1990, though, was not only the 14th birthday of Mr. Rivera's son.  It also became a critical turning point in Mr. Rivera's life.  Until that day, Mr. Rivera's life was driven by the search for drugs and the ways and means to get more drugs.  He lived to use and used to live, and his life had become wholly unmanageable.  Mr. Rivera was, simply put, in the grip of a continuing and progressive disease – Substance Use Disorder (PSR ¶¶ 68-77)[1] – that always ends the same way: jail, institutionalization or death.  Unlike many other addicts, though, Mr. Rivera had the strength of character and faith in God to overcome his addiction.  He "asked God for help" and, through prayer and meditation, achieved sobriety.  (Id.)  Indeed, Mr. Rivera "wanted to be a positive example for his children" and "wanted to change [his] life."  (Id.)  And he succeeded where so many others have failed – Mr. Rivera has now been clean and sober for

---

[1]     The *Diagnostic Manual of Mental Disorders* (the "DSM-5") recognizes "Substance Use Disorder" as a formal disorder.  See https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3767415/.  It is "a disease that affects a person's brain and behavior and leads to an inability to control the use of a legal or illegal drug or medication."  See https://www.mayoclinic.org/diseases-conditions/drug-addiction/symptoms-causes/syc-20365112.  According to the American Psychiatric Association, "[s]substance use disorder in DSM-5 combines the DSM-IV categories of substance abuse and substance dependance into a single disorder measured on a continuum from mild to severe.  Each specific substance . . . is addressed as a separate use disorder . . . but nearly all substances are diagnosed based on the same overlapping criteria."  (Exhibit 2.)

more than 30 years (since September 1, 1990) and has for those three decades been an active, regular participant in and leader of the Narcotics Anonymous community on which he heavily relies to maintain his sobriety.

Getting clean, though, was not enough of an evolution for Mr. Rivera. Rather, even though he had only an eighth-grade education, he sought to educate himself and give back to the South Bronx community in which he was raised and that fueled his crack cocaine addiction. He had to work hard to overcome his previously undiagnosed learning disability (PSR at 34) but he earned his high school equivalency degree from Metropolitan College of New York ("MCNY") in 2005. (Id. ¶ 79.) He thereafter continued his studies at MCNY, earning an Associate's Degree in Human Services in 2007, a Bachelor's Degree in Human Services in 2013 and a Master's Degree in Public Affairs and Administration in 2014. (Id. ¶ 80.) Mr. Rivera's dedication to his education and gratitude to MCNY for the opportunities it afforded him is reflected in his creation of a scholarship at MCNY for "formerly incarcerated individuals . . . or single women with children" – a program that he describes as "one of his proudest accomplishments." (Id. ¶ 81.)

Mr. Rivera also began working to give back to the South Bronx community in which he was raised. From 1992-2002 he worked as a housing specialist for Banana Kelly Community Improvement Association, Inc. ("BKCIA") (https://www.bkcianyc.org/), which had offered him housing after his 1987 conviction (35 years ago) for attempted criminal sale of a controlled substance – an offense driven by his crack cocaine addiction. (Id. ¶¶ 41, 88.) Among other things, Mr. Rivera "and others at [BKCIA] created a living skills program for individuals with HIV" – a program that he believes "was the first such program in the" United States. (Id. ¶ 88.) Mr. Rivera thereafter worked from 2003-07 as the Director of HIV Services for Housing Options & Geriatric Association Resources ("HOGAR") (https://nyconnects.ny.gov/services/hogarsupported-housing-bronx-ny-ny-iiicomm-svcs-omh-pr-298109231630).

Having chosen to "dedicate[] himself . . . to providing service to others in the community" (PSR at 24), in 2007 Mr. Rivera and two other individuals – all of whom were "single parents who wanted to create affordable housing for other single parents in the Bronx" – founded BPHN. According to its website, BPHN "was born out of the sheer necessity for addressing the very personal street homelessness of its founders." See https://bphn.org/who-we-are/. It was such a "very personal commitment at the very top of the organizational structure that drives" how BPHN treats its homeless clients – "very carefully and with utmost respect." Id. Indeed, "[i]t is because the BPHN roots emerged from the depths of homelessness and as a direct response to one of the most challenging and dehumanizing experiences, that the standards are set for what is possible – permanent housing is attainable no matter how daunting one's current housing status is." Id. And it is the foregoing "philosophy that has driven [BPHN's] core operations from its inception as a call to assistance . . . for inner-city single parents faced with homelessness and struggling to make ends meet." Id.

At its inception, BPHN had "a $700,000 budget, managing 36 housing units in 1 building." Id. Through Mr. Rivera's commitment, drive and hard work (and, obviously, the hard work and devotion of his co-founders and BPHN's staff), BPHN today manages "government contracts totaling over $70 million dollars" and "offer[s] housing and support services that span[] over 80 building sites." Id. Indeed, BPHN had 327 employees and an annual budget of tens of millions of dollars at the time of Mr. Rivera's separation from BPHN.

Such "growth with increased contractual awards is," according to BPHN, "evidence of the government's confidence in BPHN's efficient management capability with the successful acquisition of affordable supportive housing; and a determination to sincerely address the housing crisis for individuals and families."  Id.  In fact, BPHN's:

> most recent contract has elevated BPHN as the Master contractor for the City's Emergency Housing Provider Management program that is comprised of 10 vendors/subcontractors who deliver housing services to homeless persons.  Management functions are led by a highly skilled, culturally competent workforce of 5 Executive Leaders with core competency training and expertise in budget, finance, non-profit management, housing advocacy, behavioral health, and program development, with credentials at the Masters and Doctoral levels.

Id.  Although he is no longer affiliated with BPHN because of the criminal charges herein, there can be no doubt but that none of the foregoing would have been possible without Mr. Rivera's leadership, vision and hard work.

    Beginning in approximately 2013 and continuing ██████ ████████████████████, Mr. Rivera engaged in a bribery/kickback scheme with three contractors who provided services to BPHN, collecting a total of $1,249.158.93 from them. (PSR ¶19.)  First, BPHN rented a building at 1535 Taylor Avenue in the Bronx from a real estate company, Blue Stone Partners, to provide housing to its homeless clients. Mr. Rivera arranged for Blue Stone Partners to hire RJP Construction to provide contracting services (that is, to prepare the building to house BPHN's homeless clients.)  Mr. Rivera also arranged for BPHN to hire RJP Construction to assist in the conversion of a building at 1938 Webster Avenue in the Bronx into yet another facility to house BPHN's homeless clients. In exchange, RJP Construction paid kickbacks to Mr. Rivera totaling approximately $65,000, some of which he disguised as "consulting fees" paid to Community Outreach Consulting Firm ("COCF," a private consulting company that Mr. Rivera and his wife, Lanet Rivera, controlled) and some of which was paid in cash. (PSR ¶ 16.)  Second, from late 2016 to 2020 BPHN paid Prime Protective Bureau ("PPB") approximately $12 million to provide security services at BPHN-managed buildings housing its homeless clients.  In exchange, PPB paid $492,765.58 in kickbacks to Mr. Rivera in the form of checks made payable to COCF, his wife (Lanet Rivera) and TLV Consultants (a private consulting company nominally owned by Mr. Rivera's son, Victor Vasquez) as well as salary paid to Mr. Rivera's wife (Lanet Rivera).  (PSR ¶ 17.)[2]  Third, BPHN rented a building at 473 East 173rd Street in the Bronx from Urban Residences Corp. (a real

---

[2]  Mr. Rivera arranged for his wife, Lanet, to work for PPB after she was forced to resign from BPHN due to conflict-of-interest rules. As of April 2021 Mr. Rivera's wife had earned $372,568.14 in salary for her work for PPB.  That salary amount is *not* included in Mr. Rivera's restitution obligation (though it is included in his forfeiture money judgment) because she was qualified for her job at PPB and performed actual work for PPB – that is, she provided fair value in return for the salary that PPB paid her.  (PSR ¶ 17.)  Mr. Rivera's wife, Lanet, has not been charged with any criminal conduct.

estate holding company with subsidiaries that owned buildings that were rented to BPHN) to provide housing to BPHN's homeless clients.  From 2019-20 Urban Residences Corp. kicked back a total of $689,893.25 to Mr. Rivera in the form of checks made payable to TLV.  (PSR ¶ 18.)

In total, Mr. Rivera unlawfully collected $1,249,158.93 from RJP Construction, Prime Protection Bureau and Urban Residences Corp.  In connection with his guilty plea, he agreed to a forfeiture money judgment in the amount of $1,249,158.93 and to pay restitution to BPHN in the amount of $902,269.23 (the total amount of bribes/kickbacks he received less the $372,568.14 in salary that PPB paid to his wife).  (PSR ¶¶ 19, 20.)

<u>ARGUMENT</u>

I.

<u>SENTENCING PROCEDURES AND STANDARDS</u>

In <u>United States v. Booker</u>, 543 U.S. 220 (2005) the U.S. Supreme Court found that mandatory application of the Guidelines was unconstitutional and, as a remedial measure, excised 18 U.S.C. § 3553(b) from the Sentencing Reform Act of 1984.  Thus, since <u>Booker</u>, sentencing in federal court has been governed entirely by 18 U.S.C. § 3553(a), pursuant to which the Guidelines are advisory only.  District courts therefore must now consider all the 18 U.S.C. § 3553(a) sentencing factors in determining and imposing sentences that are "sufficient, but not greater than necessary" to achieve the penological objectives of the criminal justice system. <u>Booker</u>, 543 U.S. at 245-46.  <u>See also</u> <u>Nelson v. United States</u>, 555 U.S. 350, 352 (2009) ("The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable") (italics in original); <u>United States v. Crosby</u>, 397 F.3d 103, 113 (2d Cir. 2005) ("the Guidelines are no longer mandatory" and, thus, "sentencing judge[s] must consider the Guidelines and all of the other factors listed in section 3553(a)").

District courts therefore "have discretion to select an appropriate sentence, and in doing so are statutorily bound to consider the factors listed in § 3553(a), including the advisory Guidelines range." <u>United States v. Cavera</u>, 550 F.3d 180, 188 (2d Cir. 2008).  <u>See also</u> <u>United States v. Bartlett</u>, 567 F.3d 901, 908 (7th Cir. 2009) ("A judge must respect all of the statutory criteria in order to mete out a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing) (internal quotation marks omitted); <u>Crosby</u>, 397 F.3d at 113 ("the sentencing judge should decide, after considering the Guidelines and all the other factors set forth in section 3553(a), whether" to impose a Guidelines or non-Guidelines sentence).  This Court therefore is authorized and empowered to consider its "own sense of what is a fair and just sentence under all the circumstances." <u>United States v. Jones</u>, 460 F.3d 191, 195 (2d Cir. 2006). Indeed, this Court "need not accept the Sentencing Commission's penological framework. [It] may adopt its own." <u>Bartlett</u>, 567 F.3d at 908.  <u>See also</u> <u>Gall v. United States</u>, 552 U.S. 38, 50 & n.7 (2007) (courts must "make an individualized assessment based on the facts presented," which includes "a broad command to consider 'the nature and circumstances of the offense and the history and characteristics of the defendant'").  Thus, simply put, once the Guidelines range is calculated, "sentencing becomes a judgment call for the court." <u>United States v. Innarelli</u>, 524 F.3d 286, 292 (1st Cir. 2008).

II.

## THIS COURT SHOULD FIND THAT MR. RIVERA'S INDICATED GUIDELINES RANGE OF IMPRISOMENT IS 37-46 MONTHS

As detailed in his plea agreement (Exhibit 1) and his PSR, we submit that this Court should find that Mr. Rivera's Guidelines offense level is 21 pursuant to the following offense level calculation:

| | |
|---|---|
| Base Offense Level<br>(U.S.S.G. § 2B4.1) | 8 |
| Total Amount of Kickback<br>and Bribery Payments<br>(U.S.S.G. § 2B1.1(b)(1)(H)) | +14 |
| Role Adjustment<br>(U.S.S.G. § 3B1.1(c)) | +2 |
| Acceptance of Responsibility<br>(U.S.S.G. §§ 3E1.1(a), 3E1.1(b)) | -3 |
| Total Adjusted Offense Level | 21 |

(Exhibit 1; PSR ¶¶ 29-39.)  Mr. Rivera has no criminal history "points" and therefore falls within Criminal History Category I.  Thus, we submit that this Court should find that Mr. Rivera's Guidelines offense level is 21 and that his indicated Guidelines range of imprisonment is 37-46 months (though, as detailed herein, we submit that this Court should sentence him to a term of probation with a substantial community service component).















██████████████████████████      █████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████
█████████████████████

### IV.

### THIS COURT SHOULD SENTENCE MR. RIVERA TO
### TO A TERM OF PROBATION WITH A SUBSTANTIAL
### COMMUNITY SERVICE COMPONENT

Based on the sentencing factors set forth in 18 U.S.C. § 3553(a) and ████████
█████████████████████, we submit that this Court should sentence Mr. Rivera to a term of probation with a substantial service component.[6]

A.    A Term of Probation Accurately Reflects
      Mr. Rivera's History and Characteristics

Mr. Rivera has led a rather remarkable life.  Brought up by a single mother and having no relationship whatsoever with his father (an "abusive narcissist" who he never met until age 32 and never saw again) (PSR ¶¶ 47-48), Mr. Rivera was raised in the South Bronx of the 1960s. He described his mother as "hardworking," working 12-13 hours/day as a cook, which left her little time to care for Mr. Rivera except to take him to church, which served then and continues to serve today as a centering force in Mr. Rivera's life.  (Id. ¶ 51.)  Indeed, Mr. Rivera still attends church today 2-3 times/week.  (Id.)  According to Mr. Rivera, "he was left alone often during his childhood while his mother worked" – there was, simply put, "no adult supervision."  (Id.)  Indeed, he does not even "remember ever playing outside."  (Id.)

As the Court might expect, "drug activity was prevalent in the South Bronx area" in which Mr. Rivera was raised.  (Id. ¶ 52.)  He recalled "observing drug use and drug sales in the community" and even "saw bodies on the building stoop of those that had died from a heroin overdose."  (Id.)  Drugs were also present in the home in which he was raised as his uncle (who lived with his family) sold marijuana.  (Id.)  And, while no one used drugs in his home, Mr. Rivera recalls smoking marijuana (which he took from his uncle) for the first time at the tender age of 5.  (Id. ¶53.)  It was also at that age that Mr. Rivera was first introduced to "hard" drugs.  A local dealer hired him to "cut" methadone into "quarters" for sale,[7] which he did for $200/day until age 13 (1973).  His involvement in the drug trade progressed from cutting methadone to

---

[6]    Given his educational accomplishments and professional background, we submit that, per 18 U.S.C. § 3553(a)(2)(D), no term of imprisonment is necessary to provide Mr. Rivera with educational or vocational training, medical care or other correctional treatment.  Also, given that Mr. Rivera has no co-defendants, we submit that, per 18 U.S.C. § 3553(a)(6), no term of imprisonment is necessary to "avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."

[7]    Methadone was not produced in liquid or tablet form when Mr. Rivera was a child.  (PSR ¶ 53.)  Rather, it was produced in what at the time was referred to as a "biscuit."  (Id.)

selling cocaine.  (Id.)  The remainder of Mr. Rivera's childhood followed a tragic, sad yet not unknown course for that time in the South Bronx.  He became addicted to crack cocaine, had a child at age 15 and began carrying a weapon in connection with his drug activities and as his addiction progressed.  (Id.)  Fortunately, though, as detailed herein, Mr. Rivera achieved sobriety in 1990 and has successfully maintained his sobriety for more than 30 years.  (Id.)

Heartache, sickness and death were also a regular part of Mr. Rivera's younger years.  His mother suffered a heart attack in June 1995 and died at the age of 56.  (Id. ¶ 48.)  His romantic partner from 1973-1989, Margarita Vasquez, suffered from diabetes that resulted in various complications including an amputation.  (Id. ¶ 54.)  She died in 2010 or 2011.  (Id.)  But Mr. Rivera's relationship with Ms. Vasquez, who also suffered from a crack cocaine addiction, did produce the loves of his life – his son, Victor, age 45, who lives in the Bronx and recently accepted a position as a U.S. Postal Carrier and his daughter, Thaina Rodriguez, age 44, who has served in the U.S. Coast Guard for 20 years and is today a "warrant officer" stationed in Maine for the U.S. Coast Guard Judge Advocate General.  (Id. ¶ 55.)  Mr. Rivera's son, Victor, Jr., reported how Mr. Rivera "loves to help people" and that he is "very proud of him from where he's come from and where he is now," describing his father as an "exceptional man" and the reason he is "the man I am today."  (Id. ¶ 60.)  Likewise, Mr. Rivera's daughter, Thaina, advised that Mr. Rivera "has an emotional support network consisting of family members as well as those in the sober community" and that she believes her father "has 'learned his lesson with the trouble he's in now.'"  (Id.)  Ms. Rodriguez also has two children – that is, Mr. Rivera's grandchildren.  (Id.)  Mr. Rivera met his current wife, Lanet, in 2006.  (Id. ¶ 56.)  They married in 2009 but are now separated because of Mr. Rivera's infidelity and the instant criminal case.  (Id.)

Mr. Rivera's friends, those with whom he worked as President and Chief Executive Officer of BPHN and a variety of community and religious leaders in the South Bronx have reported consistently about Mr. Rivera's character.  For example, Anthony T. Jones, the State Committeeman and 5th Vice Chair of the Democratic Party of Kings County (and who had a childhood similar to that of Mr. Rivera), wrote that Mr. Rivera "is not just anyone, he is a person that has helped people with their lives when others turn them away.  He has helped so many people both men and women within the agency.  I can honestly say that I have yet to hear even now people speaking negatively of him.  (Exhibit 4.)  Mr. Jones also believes that Mr. Rivera "has immense talent" and that he should be placed "somewhere to work with our youth, the elderly, or within the homeless population in order that he may continue to help save lives and help those who need to hear his story and accomplishments," rather than prison.  (Id.)  Likewise, Jenny Rivera Lozado (no relation) who, like Mr. Rivera, has "been involved in [the] social service field for over 30 years," described how she and Mr. Rivera "believe in the importance of elevating our people, whether [it] is through services, prayer or providing opportunities to work, it has always been the same. . . . [U]ltimately the end game was to ensure equal access to education, healthcare, employment and affordable housing."  (Exhibit 5.)  She also observed that Mr. Rivera's "undying commitment to our marginalized communities is unconditional and quite honestly cannot be measured or compared to a mistake that undoubtedly cost his family, friends and career, and more importantly his legacy."  (Id.)  And, Natasha Villanueva Medina, a former BPHN employee, summed up Mr. Rivera with the following words: "Mr. Rivera is a man who gives people opportunity and chances and he sees the good or the willingness and goes on his good instinct.  He was always smiling in his office if I had a question he would not hesitate or seem[] bothered.  He is always willing to assist."  (Exhibit 6.)

We also offer the following reflections on Mr. Rivera's history and characteristics, particularly as regards his life's work:

- Mr. Rivera "has always been respectful, kind-hearted, empathetic, and helpful. . . .  Any time we received a call about someone in need, especially children, Mr. Rivera would do what most CEOs wouldn't, he would get on the phone and ask about their situation, gather as much information, and find ways to assist a family in need. . . . Rather than running away from the community that raised him straight into a midtown office, he built an organization dedicated to helping those in need, in that same community" (Exhibit 7);

- "Mr. Rivera has always demonstrated his heart for the homeless and deprived population in our community by spearheading and supporting groups such as Manna for Life, a food pantry that addressed the needs of this population.  God allowed Mr. Rivera to flourish because of his dedication to the poor, oppressed, homeless populations while also ministering to them spiritually" (Exhibit 8);

- "In October 2017 I joined Victor Rivera and a few other volunteers in a Hurricane Maria first responder's mission to Puerto Rico to pray with, encourage and to provide fresh bottled drinking water, food, clothing and other basic essentials to hundreds of the impoverished people who were in the areas most-affected by least-helped after the onslaught of Hurricane Maria.  As one of the principle leaders of this volunteer humanitarian team, Victor engaged the local political leaders, made financial donations and advocated for the people most in need" (capitalization omitted) (Exhibit 9);

- "Thr[ough] hard work, Victor presided over a period of tremendous growth for BPHN.  BPHN, with Victor's leadership, has committed to solve the housing problems in the Borough of the Bronx by transforming lives and creating holistic paths to permanent housing and employment for the borough's homeless population. In my opinion, Victor has demonstrated to be a very capable and reliable member of their community.  The U.S. would be well served by granting Victor leniency and allow him to be of service to the Bronx community" (Exhibit 10);

- "Mr. Rivera is a charismatic, focused, people person.  He has helped countless individuals in the South Bronx through training, employment, and job development to

13

further the mission of Bronx Parent Housing Network" (Exhibit 11); and

- "During my time working with Victor, he was always cooperative and did whatever he could to house the client. [Mr.] Rivera was someone that I counted on to come through with a placement, and he usually did" (Exhibit 12).

The U.S. Supreme Court has directed that 18 U.S.C. § 3553(1) contains "a broad command to consider . . . the history and characteristics of the defendant" when determining and imposing sentence. Gall, 522 U.S. at 50 n.6 (internal quotation marks omitted). Thus, we submit that Mr. Rivera's remarkable personal background, journey, accomplishments and characteristics as detailed herein all support imposition of a sentence of probation with a substantial community service component. See, e.g., United States v. Morales, Case No. 09-CR-617 (JBW), 2010 WL 3781017 (E.D.N.Y. Sept. 21, 2020) (imposing a non-custodial sentence after finding that "[d]efendant appears to be contrite and has demonstrated that she understands the seriousness of the crime. Defendant comes from a stable matriarchal family and has support from her extended family. She has educated herself despite coming from deprived circumstances"); United States v. Gayle, Case No. 09-CR-35S (JBW), 2010 WL 2540488 (E.D.N.Y. June 17, 2010) (imposing a non-custodial sentence in part because defendant's "family relationships are strong, and she has been a model to many people. . . . She is the primary source of support, both financial and psychological, for her young child"); United States v. Chang Miao Ye, Case No. 09-CR-184 (JBW), 2010 WL 447374 (E.D.N.Y. Jan. 22, 2010) (imposing a non-Guidelines sentence where "defendant has demonstrated a strong work ethic and a commitment to supporting his family"); United States v. Guzman, Case No. 08-CR-332 (JBW), 2009 WL 1617942 (E.D.N.Y. June 2, 2009) (imposing a non-Guidelines sentence where defendant "appears to be contrite and has close family relationships"); United States v. Singh, Case No. 08-CR-868 (JBW), 2009 WL 4626645 (E.D.N.Y. Dec. 7, 2009) (imposing a non-Guidelines sentence where defendant "is a hard working man who helped support his family and has otherwise led a lawful life").

B.    A Term of Probation Accurately Reflects the
       Nature and Circumstances of Mr. Rivera's Offense

Mr. Rivera offers no excuse or justification for having solicited and accepted bribes and kickbacks from contractors (Blue Stone Partners, Urban Residences Corp. and Prime Protective Bureau) who provided construction, security and real estate services to BPHN. Indeed, he is deeply remorseful for and accepts full responsibility for his criminal conduct. Still, we submit that a sentence of probation with a substantial community service component would accurately reflect the nature and circumstances of Mr. Rivera's offense.

First, the loss associated with Mr. Rivera's criminal conduct ($1,249,158.93) is responsible for 14 of the 21 "points" making up his Guidelines offense level (Level 21) as stipulated by the parties and as reflected in the PSR. Put differently, the loss associated with Mr. Rivera's criminal conduct is responsible for two-thirds of his Guidelines offense level calculation. We submit that that Guidelines offense level and the loss amount upon which it is principally based is unreasonable and demonstrates an oft-criticized aspect of the Guidelines – that is, a disconnect between: (1) the range of imprisonment indicated by the amount of loss; and

14

(2) a defendant's personal culpability as reflected by the nature and circumstances of his/her offense. As the Court put it in <u>United States v. Biheiri</u>, 356 F. Supp. 2d 589 (E.D. Va. 2005):

> fashioning a just sentence cannot be reduced to a mere arithmetical exercise. Reliance solely on numbers, quantities, offense levels, criminal history categories, and matrices produces an illusory precision that obscures the fact that sentencing, in the end, must involve the exercise of *judgment,* <u>i.e.</u>, a judge's discerning opinion that results from identifying and weighing fairly all of the factors relevant to achieving the statutory sentencing goals.

<u>Id.</u> at 594 (emphasis in original). <u>See also</u> <u>United States v. Gupta</u>, 904 F. Supp. 2d 349, 350 (2012) ("Imposing a sentence on a fellow human being is a formidable responsibility. It requires a court to consider, with great care and sensitivity, a large complex of facts and factors. The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense. Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results); <u>United States v. Adelson</u>, 441 F. Supp. 2d 506, 509 (S.D.N.Y 2006) (criticizing "the inordinate emphasis that the Sentencing Guidelines place in fraud on the amount of actual or intended financial loss" without any explanation as to "why it is appropriate to accord such huge weight to [this] factor[]"); <u>United States v. Ranum</u>, 353 F. Supp. 2d. 984, 990 (E.D. Wis. 2005) ("One of the primary limitations of the guidelines, particularly in white-collar cases, is their mechanical correlation between loss and offense level . . . . [F]rom the victim's perspective, the loss is the same no matter why it occurred. But from the standpoint of personal culpability, there is a significant difference"); <u>United States v. Emmenegger</u>, 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004) ("Were less emphasis placed on the overly-rigid loss table, the identification of different types of fraud or theft offenses of greater or lesser moral culpability or danger to society would perhaps assume greater significance in assessing the seriousness of different frauds"). <u>See also</u> Hon. Myron H. Thompson, Editorial, *Sentencing and Sensibility*, N.Y. TIMES, Jan. 21, 2005 ("If the 600-plus pages of the most recent set of sentencing guidelines have taught us anything, it is that punishment cannot be reduced to an algorithm").

The foregoing is especially true when contending with the loss table in Section 2B1.1 of the Guidelines, which is "a relatively weak indicator of the moral seriousness of the offense or the need for deterrence." <u>Emmenegger</u>, 329 F. Supp. 2d at 427. In particular, the Guidelines vastly overstate the culpability of fraud offenders with high loss amounts, such as Mr. Rivera. Simply put, the loss table in Section 2B1.1 of the Guidelines is "fundamentally flawed, especially as loss amounts climb. The higher the loss amount, the more *distorted* is the guideline's advice to sentencing judges." <u>United States v. Corsey</u>, 723 F.3d 366, 380 (2d Cir. 2013) (Underhill, J., concurring) (emphasis added). As a well-known sentencing commentator put it, for offenders "convicted of fraud offenses associated with very large guidelines loss calculations, the guidelines now are divorced both from the objectives of Section 3553(a) and . . . common sense. [The] guidelines calculations in such cases are of diminished value to sentencing judges. <u>Id.</u> (quoting Frank O. Bowman, III, *Sentencing High–Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent. Rep. 167, 168 (2008) (punctuation omitted)).

Here, Mr. Rivera's Guidelines offense level includes a 14 "point" enhancement based on the $1,249,158.93 "loss" associated with his offense of conviction. That figure distorts his Guidelines offense level calculation by dramatically increasing his indicated range of imprisonment. This inherent absurdity is further evidenced by the fact that the $1,249,158.93 "loss" amount herein would have generated a 9 (not 14) "point" enhancement under the original 1987 version of the Guidelines. Given the significant and unreasonable effect of the loss amount on Mr. Rivera's Guidelines offense level, we submit that this Court should accord little deference to his Guidelines offense level (21) and indicated range of imprisonment (37-46 months imprisonment). We, of course, acknowledge that this Court must consider Mr. Rivera's Guidelines offense level and indicated range of imprisonment as a "starting point" in its sentencing analysis. But we submit that this Court should find that offense level 21 is both inconsistent with modern thinking as to the usefulness of the loss table in Section 2B1.1 of the Guidelines in determining fair, just and appropriate sentences for financial fraud offenses and also recognize that a sentence of between 37 and 46 months therefore is draconian as applied herein.

Second, the government maintains that Mr. Rivera's "bribery and kickback arrangements ensured that the procedures by which . . . contractors were hired were illegitimate." (PSR at 24.) But not even the government disputes that Blue Stone Partners, Urban Residences Corp. and Prime Protective Bureau provided actual services to BPHN. For example, both Blue Stone Partners and Urban Residences Corp. leased actual apartment buildings to BPHN so that BPHN could safely house its homeless clients. Likewise, Prime Protective Bureau provided actual security services for the apartment buildings in which BPHN housed its homeless clients. Put differently, Mr. Rivera's bribery/kickback scheme had no effect on BPHN's ability to provide services to its homeless clients. Rather, according to even the government's theory, Blue Stone Partners, Urban Residences Corp. and Prime Protective Services all actually provided the services for which they contracted with BPHN.

Given the foregoing, Mr. Rivera's bribery/kickback scheme simply affected the price that BPHN paid for services that it obtained. There were no, for example, phantom invoices or non-existent contracts between BPHN and its service-providers. We therefore submit that a sentence involving a prison term would be inconsistent with the nature and circumstances of Mr. Rivera's offense. And we further submit that this Court should temper justice with mercy and impose a sentence not greater than necessary to meet the 18 U.S.C. § 3553(a) sentencing factor relating the amount of loss associated with Mr. Rivera's offense.

C.     A Term of Probation Is Sufficient, But Not Greater Than
       Necessary, to Reflect the Seriousness of Mr. Rivera's Offense,
       Promote Respect for the Law and Provide Just Punishment

As detailed herein, Mr. Rivera deeply regrets his criminal conduct – regret that is reflected in: ███████████████████████████████████████████████████ ███████████████████████████████████████████████████████ (2) his prompt admission as to his wrongdoing and prompt guilty plea; and (3) the shame and humiliation associated with his steep fall from grace. Indeed, as described in the PSR, Mr. Rivera's "fall from grace comes after quite an impressive trajectory." (PSR at 28 (internal quotations marks omitted).) Additionally (and with the exception of his conduct herein), Mr.

16

Rivera has been a productive and law-abiding member of society, dedicating his life to serving the homeless, disadvantaged and disenfranchised of the South Bronx.  We offer the following observations by Mr. Rivera's family and friends of his remorse, regret, shame and acceptance of responsibility as evidence of same:

- "Victor is embarrassed, ashamed or himself, remorseful and has told me he had repented to GOD for the sins he committed; having fallen to the temptations of power, money and the lust of the flesh" (Exhibit 9);

- "I know Mr. Rivera is sorry for what has transpired.  I know he is honest enough to admit that and take responsibility for his actions, because one thing about him is he is a man of his word" (Exhibit 6);

- "I am very much aware of his conviction and yet despite of it, one thing I am certain of, Victor takes full responsibility and wholeheartedly regrets what he has done" (Exhibit 5);

- "Mr. Rivera knows that anything he did that was inappropriate, he takes full responsibility for his actions" (Exhibit 4);

- "I learned of Mr. Rivera's transgressions through the media and was incredibly surprised and disappointed.  I confronted him, and he admitted his wrongdoing.  He has suffered significantly, personally, financially, emotionally, and spiritually for his wrongdoing.  However, he is penitent . . ." (Exhibit 11).

- "Throughout this ordeal, he has broken down on several occasions, with feelings of remorse and acceptance of responsibility. . . .  I have reminded him, we are all human, we all make mistakes, it is a matter of taking accountability, admitting your wrongs, learning from your mistakes, and putting those lessons to use so the mistakes are not repeated" (Exhibit 7);

- "I am fully aware of the crime that Mr. Rivera has been convicted of and our prayer group continuously lifts him up in prayer.  We all have made mistakes in our lives and have paid consequences for them.  But we also deserve a God who abounds in mercy and grace. Sometimes we sow to our fleshly desires such as money, power and greed.  No one is immune and we have to pray diligently to avoid those things.  For Mr. Rivera it was an issue of money and power, a strong desire he was unable to overcome.  Money is not the root of all evil, but the LOVE of money is, and

17

Mr. Rivera succumbed. Sometimes God will hit you with a 2x4 to get your attention. He exalts those who humble themselves and he humbles those who exalt themselves and Mr. Rivera has experienced both ends of this spectrum. He now finds himself without anything except the support of friends who know his true character and is seeking restoration and forgiveness which will happen because I believe he is truly repentant. It's not pretty, it's painful, but it is necessary for transformation to take place. Mr. Rivera is a man after God's heart, and he is now suffering the consequences of his poor choices. He's lost a lot and is now at the bottom looking up" (Exhibit 7); and

● "In my opinion, Victor has demonstrated to be a very capable and reliable member of [his] community. The U.S. would be well served by granting Victor leniency and allow him to be of service to the Bronx community" (Exhibit 10).

Although he engaged in serious criminal conduct, Mr. Rivera has already paid a steep price for having done so – loss of a prestigious position at a public service organization that he co-founded, that he was proud of and into which he had poured decades of work and humiliation before his friends, family and professional colleagues. It was such a significant fall from grace that Mr. Rivera is now working on the street in a food truck. (PSR ¶ 84.) Simply put, Mr. Rivera's criminal conduct radically altered the trajectory of his life and resulted in the loss of any real opportunity to continue his life's work. We therefore submit that a term of probation with a substantial community service component is more than sufficient, but not greater than necessary, to reflect the seriousness of Mr. Rivera's criminal conduct, promote respect for the law and provide just punishment. See, e.g., United States v. Alatsas, Case No. 06-CR-473 (JBW), 2008 WL 238559 (E.D.N.Y. Jan. 16, 2008) (imposing non-Guidelines sentence of three years probation on a defendant convicted of conspiracy to commit loan application fraud notwithstanding a Guidelines range of 24-30 months imprisonment based, in part, on a finding that "[s]pecific deterrence is provided by the shame created by the felony conviction, the cost of defense and strict restitution requirements. General deterrence is also sufficiently satisfied by the sentence");

D.    A Term of Probation is Sufficient, But Not Greater Than Necessary, to Afford Adequate Deterrence to Criminal Conduct and Protect the Public From Further Offenses by Mr. Rivera

BPHN terminated Mr. Rivera upon publication of the aforementioned New York Times article. He is therefore no longer affiliated with BPHN in any form or fashion. Since having been terminated, Mr. Rivera has worked as an Amazon truck loader and a sales associate at a jewelry store. (PSR ¶¶ 85-86.) More recently, he and a friend opened a food truck on Southern Boulevard in the Bronx that serves Puerto Rican food. (Id. ¶ 84.) Additionally, Mr. Rivera promptly admitted his criminal conduct, pled guilty and accepted full responsibility for his actions. He understands that his conduct was wrong and is remorseful for what he did. ▪

████████████████████████████████████████████ Indeed, he never contested the government's allegations about his unlawful conduct.

Given the foregoing, no prison term is needed to deter Mr. Rivera from further criminal conduct or protect the public from future crimes by Mr. Rivera because he will never again be in a position (that is, a leadership position at a non-profit or for profit organization) at which he could commit the same or a similar offense. Also and because of who he is (as reported by his family, friends and colleagues), he is at the lowest probability of ever committing the instant or any other offense again. Thus, we submit that no prison term is necessary to satisfy the 18 U.S.C. § 3553(a) sentencing objectives of affording adequate deterrence to future criminal conduct and protecting the public from further offenses. See, e.g., United States v. Walden, 470 F.3d 735, 739-40 (8th Cir. 2006) (court properly imposed a sentence below the Guidelines on a defendant convicted of mail fraud in part because of defendant's age (67) and low likelihood of recidivism); United States v. Butler, 264 F.R.D. 37, 40 (E.D.N.Y. 2010) (imposing non-Guidelines sentence in part because defendant's "loss of his securities license, probably his ability to work in the financial sector, and the impact of this conviction on his employability" combined with the conclusion that it "is unlikely he will engage in further criminal activity in light of his continuing supervision, the need to provide for his wife and young son, and the support of his family and many friends and associates"); United States v. Nellum, Case No. 04-CR-30 (PS), 2005 WL 300073, at *3 (N.D. Ind. Feb. 3, 2005) (imposing a non-Guidelines sentence and noting that recidivism rates for defendants between the ages of 41 and 50 is less than half of that of defendants under the age of 21).

E.     A Sentence of Probation Provides Mr. Rivera
       With the Greatest Opportunity and Likelihood
       of Continued Rehabilitative Success

Following recovery from his crack cocaine addiction, Mr. Rivera earned a high school degree, a college degree and a master's degree so that he could most effectively fulfil his lifetime mission of serving the homeless in the South Bronx. That lifetime goal led him to found BPHN in the early 2000s. Given his druthers, Mr. Rivera would continue his work at BPHN. But that is obviously not possible. Mr. Rivera therefore is professionally at "square one." A sentence of probation with a significant community service component would allow Mr. Rivera the greatest opportunity to redeem himself by returning to his roots of serving the communities that BPHN serves, such as at another social-services organization. Indeed, there can be no doubt but that Mr. Rivera has the skills, knowledge and know-how to do the public service work to which he has dedicated his professional life. A prison term, however short, would be to waste those skills, particularly as New York emerges from the economic downturn precipitated by the COVID-19 pandemic. Rather, sentencing Mr. Rivera to a term of probation with substantial community service component would – particularly today – accomplish the dual goals of punishing Mr. Rivera for his decidedly serious conduct and allowing Mr. Rivera to continue the good works to which he has dedicated 30-plus years of his life. Put differently, punishing Mr. Rivera with a prison term would accomplish nothing other than punish him for punishment's sake, which we submit is an insufficient reason to imprison someone with the deep knowledge, grit and skills that Mr. Rivera has. A sentence of probation with a substantial community service component, by contrast, would best serve the interests of Mr. Rivera's South Bronx community and, more broadly, the community of people in need of social services because of the societal insecurities faced by those most impacted by the COVID-19 pandemic.

F.    A Sentence of Probation Provides Mr. Rivera
      With the Greatest Opportunity and Likelihood
      of Fulfilling His Restitution Obligation to BPHN

Given his guilty plea, Mr. Rivera will have to reinvent himself.  As an individual who is creative and self-motivated, Mr. Rivera will no doubt find work (such as, say, franchising his burgeoning food truck business or developing another venture to help and support the disadvantaged type of people that he created BPHN to serve) to support himself and his family and, importantly, pay restitution to BPHN.  The sooner Mr. Rivera is able to do so, the sooner he will be able to satisfy his restitution obligation to BPHN.  Thus, while 18 U.S.C. §3553(a) mandates punishment for a host of reasons, we submit that 18 U.S.C. §3553(a)'s mandate to impose a sentence that allows for and supports the payment of restitution is important for offenders who have or will have the ability to pay restitution.  And, given all of the other reasons detailed herein for a non-custodial sentence, we submit that punishment that allows for Mr. Rivera to start fulfilling his restitution obligation to BPHN is as important as any of the other 18 U.S.C. §3553(a) sentencing factors and, thus, supports imposition of a sentence of probation with a substantial community service component.

G.    Given His Pre-Existing Medical Conditions,
      a Sentence of Probation Is Appropriate to Protect
      Mr. Rivera from the Risks Posed by COVID-19

We acknowledge that COVID-19 – standing alone – is not (except perhaps for those who are critically ill) grounds for imposition of a non-custodial sentence.  But we do submit that the risks posed by COVID-19 – even for those, like Mr. Rivera, who have been vaccinated and boosted – can still be grounds for a non-custodial sentence when combined with additional factors such as advanced age or serious underlying health conditions that place a defendant at a greater health risk from COVID-19.[8]

Here, as detailed in his PSR, Mr. Rivera suffers from a number of physical and ████████████████████████ that put him at higher risk from COVID-19.  First, ████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████  Second, although not specifically listed by the CDC as a medical condition that can put an individual at a higher risk from COVID-19, COVID-19 is obviously a respiratory virus that can have a detrimental impact on the lungs of those who are infected.  Indeed, some who are infected require supplemental oxygen; others suffering more serious cases can be placed on a ventilator to assist in breathing.  Thus, the CDC has identified "[c]hronic lung disease" as placing individuals at a higher risk from COVID-19.  Id. ████████████████████████████████████████████████████████████

---

[8]    As the Court knows, in a parallel context – sentence reduction motions pursuant to 18 U.S.C. § 3582(c)(1)(A) – numerous district courts around the nation have found that COVID-19, when combined with pre-existing medical conditions, can establish the "extraordinary and compelling reasons" necessary for a sentence reduction.

████████████████████████████████████████████████ Third, again, although not specifically listed by the CDC as a COVID-19 risk factor, ████████████████████████████████████████

██████████████ See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/peoplewith-medical-conditions.html ("Having heart conditions such as heart failure, coronary artery disease, cardiomyopathies, and possibly high blood pressure (hypertension) can make you more likely to get very sick from COVID-19"). Finally, the CDC reports that "[m]ental health conditions" – that is, "mood disorders, including depression, and schizophrenia spectrum disorders" – can "make you more likely to get very sick from COVID-19." Id. ████████████

████████████████████████████████████   ██████████████   ████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

        We do not seek to overstate the risk to Mr. Rivera from COVID-19 should this Court sentence him to a term of imprisonment.  But the reality is that Mr. Rivera suffers from myriad physical and ████████████████████████ that, considered collectively, place him at a higher risk of an adverse outcome should he contract COVID-19.  We therefore submit that Mr. Rivera's physical and ██████████████████████ support imposition of a term of probation with a substantial community service component.  See United States v. Skelos, Case No. 15-CR-317 (KMW), 2020 WL 1847558, at *1 (S.D.N.Y. Apr. 12, 2020) ("[j]ails and prisons are powder kegs for infection. People in jails and prisons cannot practice social distancing, control their exposure to large groups, practice increased hygiene, wear protective clothing, obtain specific products for cleaning and laundry, avoid frequently touched surfaces, or sanitize their own environment"); United States v. Taveras, 436 F. Supp. 3d 493, 500 (E.D.N.Y. 2006) (life expectancy in federal prison – with its stressors, violence and disease – is considerably shortened).

## CONCLUSION

        Mr. Rivera is a good man who did bad things, not a bad man who did bad things.  He is regretful, remorseful and accepting of full responsibility for his unlawful conduct.  He poses no threat to any individual or the community.  Indeed, he has long served, not threatened, his community. ████████████████████████████████████████████████

████████████████████████████████████████████████████████ Simply put, "no right-minded observer would regard" a sentence of probation with a substantial community service component "under these circumstances as a windfall."  United States v. Mongelli, Case No. 02-CR-307 (NGG), 2020 WL 6449237, at *3 (E.D.N.Y. Nov. 3, 2020).  Rather, we submit that a sentence of probation with a substantial community service component would be the "right result" for the "right defendant" for the "right reasons."  No prison term is necessary to accomplish the 18

U.S.C. §3553(a) sentencing objectives that a term of probation with a substantial community service component could equally accomplish.  See United States v. Ministro-Tapia, 470 F.3d 137, 142 (2d Cir. 2006) (if this Court "conclude[s] that two sentences" – one consistent with and one below the Guidelines – "equally serve[] the statutory purposes of § 3553, it [cannot], consistent with the parsimony clause, impose the higher" sentence).

        Accordingly, we respectfully request that this Court sentence Mr. Rivera to a term of probation with a substantial community service component.[9]

        Thank you for your consideration and attention to this matter.

        Respectfully submitted,

        /s/

        Harlan Protass

        *Counsel for Defendant*
        *Victor Rivera*

cc:    David Abramowicz, Esq. (via ECF)
       Tara LaMorte, Esq. (via ECF)
       Assistant United States Attorneys

       Sara Willette (via e-mail)
       U.S. Probation Officer

---

[9]    Should this Court sentence Mr. Rivera to a term of imprisonment, we respectfully request that it recommend to the BOP that it designate him to FCI Fort Dix so that: (A) he can continue his long-standing, long-term recovery work from his crack cocaine addiction by participating in that facility's Residential Drug Abuse Program ("RDAP") because the 2-3 Narcotics Anonymous meetings he has attended each week for the past 30-plus years would not be available to him; and (B) he can be near his family in New York.  Additionally, if this Court sentences him to a term of imprisonment, we respectfully request that it direct that Mr. Rivera be permitted to self-surrender to whatever BOP facility to which he is designated.