

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One St. Andrews Plaza*
*New York, New York 10007*

May 13, 2022

**By ECF**

The Honorable Sydney H. Stein
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

          Re:    <u>United States</u> v. <u>Victor Rivera</u>, 21 Cr. 221 (SHS)

Dear Judge Stein:

      The Government respectfully submits this letter regarding the sentencing of defendant Victor Rivera, which is scheduled for 2:30 p.m. on Friday, May 20, 2022. A proper application of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") results in a Guidelines range of 37 to 46 months' imprisonment. For the reasons discussed below, the Government respectfully submits that a below-Guidelines sentence that includes a substantial term of imprisonment would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

    I.    **Offense Conduct**

      Rivera was the President and Chief Executive Officer ("CEO") of Bronx Parent Housing Network ("BPHN"), a non-profit housing and social services organization that operated soup kitchens, homeless shelters, and affordable-housing facilities in New York City. BPHN annually spent millions of dollars in public funds on real estate, security, cleaning, construction, and food expenses, among other costs related to services BPHN provided. (PSR ¶ 12).

      From approximately 2013 until 2020, Rivera engaged in a scheme to enrich himself and his relatives by soliciting and accepting bribes and kickbacks from contractors doing work related to or for BPHN. The scheme yielded Rivera hundreds of thousands of dollars in illicit gains, while depriving BPHN of its intangible right to the honest services of its President and CEO. (PSR ¶ 13).

      Rivera laundered some of the corrupt payments through intermediary entities he controlled. For example, from approximately 2019 to 2020, co-conspirators who subleased property to BPHN wrote checks for purported consulting fees—which were in fact kickback

payments—to a purported consulting company ("Consulting Company-1") nominally owned by Rivera's son. Rivera then used the Consulting Company-1 funds for his own benefit, including by writing or causing others to write official checks from Consulting Company-1's bank account to pay down the mortgage on his personal residence. (PSR ¶ 14).

Rivera is responsible for kickback arrangements involving three different contractors. (PSR ¶ 15).

First, from 2013 to 2014 and again from 2017 to 2018, Rivera accepted kickbacks from a construction company ("Construction Company-1") controlled by Fernando Rodriguez.[1] The kickbacks totaled approximately $66,500. From 2013 to 2014, Rivera arranged for Construction Company-1 to obtain a contract with a real estate company ("Real Estate Company-1") for construction work at a building on Taylor Avenue. Rivera arranged for Real Estate Company-1 to hire Construction Company-1 to prepare the site to be used as a shelter, with BPHN renting the shelter space from Real Estate Company-1. In return, Rivera demanded—and Rodriguez paid—approximately 7 percent of what Real Estate Company-1 paid Construction Company-1. Rodriguez disguised the kickbacks as payments for "consulting fees" to a company ("Consulting Company-2") Rivera and his wife controlled. From 2017 to 2018, Rivera arranged for BPHN to hire Construction Company-1 to help convert a building on Webster Avenue into a BPHN-operated shelter. In return for getting Construction Company-1 hired by BPHN, Rivera directed Rodriguez to pay Rivera kickbacks. Once again, Rodriguez paid some of those kickbacks in the form of checks to Consulting Company-2 for purported "consulting fees." Other kickbacks were paid to Rivera in cash. (PSR ¶ 16).

Second, from late 2016 to 2020, Rivera accepted kickbacks from a security company ("Security Company-1"). BPHN paid Security Company-1 more than $12 million to provide security at BPHN-managed apartment buildings. In return, Security Company-1's CEO paid Rivera kickbacks totaling approximately $492,765.58 in the form of checks to Consulting Company-2, checks to Rivera's wife, a check to Consulting Company-1, and salary payments Security Company-1 made to Rivera's wife. Security Company-1 hired Rivera's wife at Rivera's urging after she was required to resign from BPHN due to conflict-of-interest rules. As of April 2021, Rivera's wife had collected approximately $372,568.14 in salary from her work at Security Company-1. BPHN board minutes show that Rivera disclosed neither his wife's employment nor his receipt of kickback payments when recommending that BPHN enter into one of the Security Company-1 contracts. (PSR ¶ 17).

Third, Rivera collected $689,893.35 in kickbacks from a real estate company ("Real Estate Company-2") from 2019 to 2020. BPHN subleased space from Real Estate Company-2 for a publicly funded shelter on East 173rd Street. After receiving rent payments from BPHN, which in turn had received much of its funding for the rent payments from the City, Real Estate Company-2 regularly paid kickbacks to Rivera in the form of checks to Consulting Company-1,

---

[1] Rodriguez is being prosecuted for his role in this scheme in a separate case before this Court, *United States v. Fernando Rodriguez*, 20 Cr. 174 (SHS). Rodriguez has pleaded guilty, but has not been sentenced. (PSR ¶ 9).

Hon. Sidney H. Stein
May 13, 2022
Page **3** of **6**

some of which falsely stated that the payments related to "Consultation." Consulting Company-1 had few if any business expenses, based on its financial accounts. Rivera used much of the money Real Estate Company-2 gave Consulting Company-1 for personal expenses, including to pay the mortgage on his personal residence. (PSR ¶ 18).

## II.      Procedural History, Guilty Plea, and Guidelines Calculation

On March 24, 2021, Rivera surrendered voluntarily for arrest and consented to the filing of Information 21 Cr. 221 (SHS) (the "Information"), which charged Rivera in three counts. (PSR ¶¶ 1-4, 22). On February 7, 2022, Rivera pleaded guilty, pursuant to a written plea agreement with the Government, to Count One of the Information. (PSR ¶ 6).

In the plea agreement, the parties stipulated that the applicable Guidelines offense level is 21, based on a base offense level of 8 under U.S.S.G. § 2B4.1(a), a 14-level increase under U.S.S.G. § 2B1.1(b)(1)(H) because the value of the bribes or improper benefits conferred exceeded $550,000 but did not exceed $1,500,000, a 2-level increase under U.S.S.G. § 3B1.1(c) because Rivera was an organizer, leader, manager, or supervisor of criminal activity, and a 3-level reduction under U.S.S.G. § 3E1.1(a)-(b) for Rivera's acceptance of responsibility. (PSR ¶¶ 6(a)-(f)). The parties further stipulated that Rivera's Criminal History Category is I because he has zero criminal history points, and, accordingly, that the Guidelines range of imprisonment is 37 to 46 months and that the Guidelines fine range is $15,000 to $150,000. (PSR ¶¶ 6(g)-(h)).

Rivera agreed under the plea agreement to a forfeiture money judgment in the amount of $1,249,158.93, the sum of the kickback payments from Construction Company-1, Security Company-1, and Real Estate Company-1, and to forfeit his interest in cash payments totaling $53,745.72 that he collected while working proactively to assist the Government's investigation of others. (PSR ¶¶ 6(i), 19). In addition, Rivera agreed to pay restitution to the victim of his offense, BPHN, in the amount of $902,269.23, representing the sum of the kickback payments, minus the salary payments Security Company-1 paid to Rivera's wife.[2] (PSR ¶¶ 6(j), 20).

In the Presentence Report, the Probation Department concurs with the parties' Guidelines (PSR ¶¶ 29-42, 97), forfeiture (PSR ¶ 109), and restitution (PSR ¶ 107) calculations, and recommends that the Court sentence Rivera principally to 37 months' imprisonment (PSR at 27).

## III.     Applicable Law

The Guidelines still provide important guidance following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). The Guidelines provide the "starting point and the initial benchmark" in sentencing proceedings. *Gall v. United States*, 552 U.S. 38, 49 (2007). After that calculation, the Court must consider the factors outlined in 18 U.S.C. § 3553(a). *Id.* at 49-50 & n.6. Those factors are: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four

---

[2] Rivera's wife performed work for Security Company-1 and ultimately provided fair value in return for the salary payments. Accordingly, those payments are not counted toward Rivera's restitution obligation. (PSR ¶ 17).

legitimate purposes of sentencing, namely, the need (a) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," (b) "to afford adequate deterrence to criminal conduct," (c) "to protect the public from further crimes of the defendant," and (d) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7).

### IV. Discussion

A below-Guidelines sentence that includes a substantial term of imprisonment is warranted in this case based on the sentencing factors the Court must consider, particularly the nature and circumstances of the offense and the history and characteristics of the defendant, *see* 18 U.S.C. § 3553(a)(1), the need to reflect the seriousness of the offense, promote respect for the law, and provide just punishment, *see id.* § 3553(a)(2)(A), and the need to afford adequate deterrence, *see id.* § 3553(a)(2)(B).

    A.    The Nature and Circumstances of the Offense and the Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment

Rivera committed an undeniably serious crime. As President and CEO, he had a duty to act in BPHN's best interests. He was well-compensated, collecting an annual salary of $453,000 (PSR ¶ 87)—plenty of money to support his family and live comfortably. But Rivera, motivated by greed, used lucrative contracts to extract improper benefits for himself. In doing so, Rivera not only deprived BPHN of its right to his honest services, but also undermined public trust in how New York City administers essential services to its poorest residents.

As the leadership enhancement in the applicable Guidelines calculation reflects, Rivera played a significant role in the scheme. Organizations like BPHN cannot operate alone; they rely on contractors to help provide housing, security, food, and other services. Rivera, BPHN's President and CEO, had substantial power to influence which contractors BPHN selected. He wielded that power corruptly, insisting that contractors pay him a portion of the funds they received for their BPHN-related work.

In his sentencing submission, Rivera emphasizes that he received kickbacks from entities that "provided actual services to BPHN"; contends that the kickbacks therefore "had no effect on BPHN's ability to provide services to its homeless clients," but rather "simply affected the price that BPHN paid for services that it obtained"; and argues that this somehow mitigates the seriousness of his offense. (Sent. Mem. 16). His argument defies logic. By "affect[ing] the price that BPHN paid for services that it obtained"—specifically, by forcing BPHN to pay far more for services than those services were actually worth, so that contractors had enough extra money to kick back to Rivera—Rivera's criminal conduct had a direct "effect on BPHN's ability to provide services to its homeless clients." BPHN and similar organizations have finite resources, as do the public agencies that fund much of those organizations' work. Rivera's criminal conduct

resulted in an actual loss to BPHN of $902,269.23, which Rivera now owes in restitution. With that $902,000, BPHN undoubtedly could have provided additional and higher-quality services.

The nature of BPHN's work makes Rivera's offense particularly egregious. No high-ranking executive should ever demand kickbacks or let improper benefits corrupt a decision the executive makes on his or her company's behalf. But when the decision involves issues as serious as the housing and security of the homeless, the offense is that much graver. The public pays the price in increased costs. The homeless pay the price in decreased services. Having overcome homelessness and other personal hardships (*see* Sent. Mem. 2, 11-14), Rivera grasped the importance of BPHN's mission as well as anyone. A substantial sentence is required to reflect the seriousness of his conduct.

      B.      <u>The Need to Deter Criminal Conduct</u>

The need to afford general deterrence also weighs in favor of a significant term of imprisonment. Although present in all cases, that need for deterrence is heightened here because self-dealing among those who help administer services to the homeless has plagued New York City. *See, e.g.*, Amy Julia Harris, SHELTER OPERATOR CITED FOR NEPOTISM STILL GETS MILLIONS IN CITY FUNDS, N.Y. Times, Feb. 28, 2022, available at https://www.nytimes.com/2022/02/28/nyregion/african-american-planning-commission-nepotism.html (last visited May 13, 2022); Andy Newman, SHE RAN A BRONX HOMELESS SHELTER. HERE'S WHAT SHE SPENT MILLIONS ON, N.Y. Times, Nov. 23, 2021, available at https://www.nytimes.com/2021/11/23/nyregion/ethel-denise-perry-millennium-care-fraud.html (last visited May 13, 2022); Nikita Stewart, $500 MILLION FOR THE HOMELESS TARGETED IN SCHEME WITH BOGUS ADDRESSES, N.Y. Times, Jan. 29, 2020, at https://www.nytimes.com/2020/01/29/nyregion/homeless-shelters-services-fraud.html (last visited May 13, 2022). The sentence imposed must demonstrate that the consequences of committing this type of crime outweigh the benefits of collecting the type of corrupt payments that Rivera pursued.

      C.      <u>Rivera's Cooperation</u>

As detailed in the defense's sentencing submission, Rivera tried to cooperate with the Government starting in December 2020, shortly after he learned that he was under investigation. (*See* Sent. Mem. 6-11). In the months that followed, he provided historical information to the Government in proffer sessions and, under the supervision of law enforcement, took proactive investigative steps, including by secretly recording various phone communications and in-person meetings. Rivera's cooperation yielded some tangible results, leading directly to at least one arrest and to the seizure of the specific property—namely, funds totaling $53,745.72—identified in the preliminary order of forfeiture. Rivera's cooperation is a relevant consideration under Section 3553(a), and it is why the Government believes that a below-Guidelines sentence would suffice.

But Rivera has not earned—and the Government will not seek—a downward departure under U.S.S.G. § 5K1.1. The Government did not offer Rivera a cooperation agreement because it determined, after careful consideration, that he lacked credibility with respect to certain topics discussed during proffer sessions. Without Rivera available to testify for the Government as a

trial witness, the evidentiary value of much of the information he helped the Government obtain is considerably diminished. In sum, Rivera's cooperation should be viewed as a mitigating factor, but it does not warrant the drastic downward variance that Rivera requests.

## V.     Conclusion

For the reasons set forth above, the Government respectfully submits that a substantial prison term below the Guidelines range of 37 to 46 months' imprisonment is appropriate in this case and would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____/s/_____
David Abramowicz / Tara La Morte
Assistant United States Attorneys
Southern District of New York
(212) 637-6525 / 1041

cc:     Defense counsel (by ECF)